UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAJIMAN HAFIZ, et al.,

    Plaintiffs,

    v.

METROPOLITAN LIFE INSURANCE CO.,

    Defendant.

_____/

No. C 07-2114 PJH

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION FOR SUMMARY JUDGMENT**

The parties' cross-motions for summary judgment came on for hearing before this court on August 6, 2008. Plaintiffs Majiman Hafiz and Asharfun Nisha Hafiz (collectively "plaintiffs"), appeared through their counsel, Albert G. Stoll and Courtney M. Cassinelli. Defendant Metropolitan Life Insurance Co. ("defendant" or "MetLife") appeared through its counsel, Royal F. Oaks and Michael Newman. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendant's motion for summary judgment and DENIES plaintiffs' motion for summary judgment, for the reasons stated at the hearing, and as follows.

## BACKGROUND

This case is about the rescission of two life insurance policies. On December 5, 2001, defendant MetLife issued two insurance policies – MetLife Policy No. 201341767ET ("'767 Policy'") and MetLife Policy No. 201341772ET ("'772 Policy'") – in the amount of $250,000 and $400,000, respectively, to a 67 year-old woman named Ramdulari Sewak, who is now deceased. The beneficiaries of the insurance policies were Majiman Hafiz ("M. Hafiz"), the deceased's sister-in-law, and Asharfun Nisha Hafiz ("A. Hafiz"), the deceased's

1  daughter-in-law (collectively "plaintiffs").  See generally Complaint for Breach of Contract,
2  etc. ("Complaint").  Plaintiffs generally allege that, after Ms. Sewak's death, plaintiffs made
3  complete and timely claims for benefits due under both insurance policies, and that
4  defendant wrongfully attempted to rescind both policies without paying any benefits on the
5  policies.  See Complaint, ¶¶ 5-21.

6  A.      The '767 and '772 Policies

7       Ms. Sewak was born in Fiji, is of Indian ancestry, and spoke only Hindi.  Ms.
8  Sewak's son, Bhika Hafiz ("Bhika"), is married to A. Hafiz, which means that plaintiff A.
9  Hafiz is the deceased's daughter-in-law.  Plaintiff M. Hafiz is A. Hafiz' mother.  See
10  Declaration of Michael A.S. Newman ISO Def. Mot. Summary Judgment ("Newman Decl."),
11  Ex. F at 11; Ex. G at 14.  Both plaintiffs, and Bhika Hafiz, are real estate investors in
12  Northern California.  See Newman Decl., Ex. E at 28; Ex. F at 13; Ex. G at 52.

13       As noted above, the '767 and '772 Policies, described by defendant as mortgage
14  protection policies, were issued on December 5, 2001.  The decedent applied for these
15  policies, however, on November 3, 2001.  The '772 Policy provided a death benefit of
16  $400,000 and named A. Hafiz – decedent's daughter-in-law – as the beneficiary.
17  Decedent's application for the '772 Policy contained the following representations:  that A.
18  Hafiz was the decedent's "daughter" (rather than decedent's daughter-in-law); that
19  decedent had an annual income from rental property in the amount of $64,000, and that
20  she further had a personal net worth of $839,000.  See Newman Decl., Ex. F at 28, 31, 53,
21  and Exhibit 2 attached thereto.     The '767 Policy, by contrast, provided a death benefit of
22  $250,000 and named M. Hafiz as the beneficiary.  See Newman Decl., Ex. F at 68, Exhibit
23  3 attached thereto.  Defendant's application for the '767 Policy contained the following
24  representations: that M. Hafiz and M. Hafiz' husband were the decedent's "sister" and
25  "brother-in-law" (rather than simply the parents of decedent's daughter in law); that the
26  decedent received $64,000 from rental income and that she had a personal net worth of
27  $830,000.  See id.  The applications for both policies also stated that the purpose of the
28

policies was to "pay off" mortgages on property owned by the decedent that the beneficiaries would inherit in the event of decedent's death. See Newman Decl., Ex. F at Exhibits 2 and 3 attached thereto.

The MetLife agent responsible for handling the decedent's insurance applications was Stan Velu ("Velu"), who does not recall the '767 and '772 applications specifically, but states that he would have sought to accurately transcribe the applicant's statements when filling out the applications, and that he understood the terms "net worth" and "ownership" on the applications to reflect the common understanding of those terms. See Newman Decl., Ex. H at 56-58.

B.  Other Policies

In addition to the above policies, the decedent and other members of her family also applied for other MetLife policies that are not directly at issue in this case. On February 5, 2001, for example, the decedent herself applied for another MetLife policy, worth $205,000, which issued as policy no. 201934916ET ("'916 Policy"). The '916 Policy listed decedent's son Bhika as beneficiary. The '916 Policy also contained the following representations: that decedent's yearly income was $38,000 and that her net worth was $620,000; and that the purpose of the insurance policy was, among other things, to satisfy mortgage obligations. See Newman Decl., Ex. F at Exhibit 1 attached thereto.

Also on February 5, 2001, Bhika's sister's husband and the decedent's son-in-law, Chandrika Prasad ("Prasad"), applied for a second MetLife policy in the amount of $150,000. See Newman Decl., Ex. F at 93-94, 100, and Exhibit 14 attached thereto. Prasad's application named M. Hafiz as the beneficiary and owner of the policy, and indicated that M. Hafiz was Prasad's "sister" (rather than the mother of Prasad's sister-in-law). As the other policies did, Prasad's policy also stated that the purpose of the insurance was to pay off mortgage "that is being jointly held between the proposed insured and owner." See id.

Finally, less than two weeks later, on February 22, 2001, Prasad applied for

$309,000 in MetLife insurance benefits, with A. Hafiz named as beneficiary. A. Hafiz was also named as "owner" of the policy. See Newman Decl., Ex. F at 100 and Exhibit 14 attached thereto. In the application, Prasad referred to A. Hafiz as his "daughter" (rather than his brother-in-law's wife) and to Bikha as his "son-in-law" (rather than his brother-in-law). The application also stated that the purpose of insurance was to pay off mortgage on the property "being held jointly with insured and owner." See id.

C.      Decedent's Death and Subsequent Claim and Investigation

Ms. Sewak died on October 6, 2003. Plaintiffs made claims for death benefits on October 15, 2005. See Declaration of Eileen Kosiner ISO Def. Motion for Summary Judgment ("Kosiner Decl."), Ex. A at 0239. MetLife investigated the claims under both the '767 and '772 Policies. The investigation was handled by claims handler Joseph Mateo, investigator Greg Wilkins, senior underwriting consultant Eileen Kosiner, and James McCarthy. See generally Cassinelli Decl.; Kosiner Decl.

As part of the investigation, MetLife discovered that the decedent's name did not appear in any property search database. MetLife also sent an investigator to plaintiffs' and Bhika's homes and collected information from the plaintiffs and Bhika. MetLife learned that the decedent had no title to property in her name, and that any title to any of the properties claimed by decedent and plaintiffs rested in Bhika and A. Hafiz' names. See Newman Decl., Ex. F at 42-45. MetLife also discovered reason to believe that the combined debts on the properties supporting decedent's applications, amounted to much less than the amount of the insurance policy benefits secured.

Based on this and other information uncovered during the investigation, MetLife concluded that the statements made by decedent in her applications for insurance regarding net worth, income and properties, as well as the reasons for seeking insurance, were untrue. MetLife's underwriting department further determined that, had it known the true facts relating to the decedent's financial situation at the time of her application, it would not have issued either of the '767 or '772 Policies at issue. See Kosiner Decl., ¶¶ 3-4.

4

On July 27, 2006, plaintiffs' claims under both policies were rejected. Mr. Mateo sent letters to plaintiffs stating that MetLife's inquiries revealed "that the insured had neither income nor assets in the United States" and that "[i]f the financial information had been disclosed on the application, [MetLife] would not have issued the policy applied for." See Declaration of Courtney Cassinelli ISO Pl. Mot. Summ. Judg. ("Cassinelli Decl."), ¶ 27.

D.   Procedural History

Plaintiffs filed the instant complaint on April 16, 2007. They allege five causes of action against defendant: (1) for breach of contract with respect to the '772 Policy (A. Hafiz as named beneficiary); (2) for breach of the implied covenant of good faith and fair dealing with respect to the '772 Policy (A. Hafiz as named beneficiary); (3) for breach of contract with respect to the '767 Policy (M. Hafiz as named beneficiary); (4) for breach of the implied covenant of good faith and fair dealing with respect to the '767 Policy (M. Hafiz as named beneficiary); and (5) for declaratory relief regarding MetLife's contractual obligations under both policies. See Complaint, ¶¶ 22-43.

The parties have now filed cross-motions for summary judgment, seeking summary judgment with respect to all five claims alleged in the complaint.[1]

**DISCUSSION**

A.   Legal Standards

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A

---

[1] Defendant's notice of motion seeks summary judgment as to only the first, second, and third causes of action, while defendant's moving papers generally discuss the merits of all five of plaintiffs' claims. At the hearing on the parties' cross-motions, defense counsel clarified any ambiguity and stated that defendant is, in fact, seeking summary judgment with respect to all five causes of action.

1  dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to
2  return a verdict for the nonmoving party. <u>Id</u>. The court must view the facts in the light most
3  favorable to the non-moving party and give it the benefit of all reasonable inferences to be
4  drawn from those facts. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574,
5  587 (1986).

B.  Breach of Contract Claims (First and Third Causes of Action)

Both parties seek summary judgment on plaintiffs' breach of contract claims. Defendant seeks summary judgment on grounds that its rescission of the '772 Policy and the '767 Policy was justified due to the decedent's material misrepresentations in applying for the policies. Plaintiffs, for their part, contend that decedent made no material misrepresentations, or alternatively that if any were made, they are excused by the decedent's illiteracy and/or lack of understanding in English, or else chargeable to the third party MetLife agent who prepared the decedent's application – thus making defendant's non-payment of benefits an actionable breach.

As a general rule, material representations on an insurance application are grounds for the insurance company to rescind the policy. <u>See Imperial Cas. & Indemn. Co. v. Sogomonian</u>, 198 Cal. App. 3d 169, 179 (1988); <u>see also LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 156 Cal. App. 4th 1259, 1269-70 (2007)(concealment, "whether intentional or unintentional," entitles the injured party to rescind insurance); <u>see also</u> Cal. Ins. Code § 331 (same). The insurer need not prove that the applicant-insured actually intended to deceive the insurer; rather, misstatement or concealment of 'material' facts is ground for rescission – even if unintentional. <u>See LA Sound USA</u>, 156 Cal. App. 4th at 1269-70.

Materiality, in turn, is determined "by the probable and reasonable effect which truthful answers would have had upon the insurer." <u>See id</u>. The test for materiality is whether the information would have caused the underwriter to reject the application, charge a higher premium, or amend the policy terms, had the underwriter known the true facts.

6

See Old Line Life Ins. Co. v. Superior Court, 229 Cal. App. 3d 1600, 1604 (1991)("The most generally accepted test of materiality is whether or not the matter misstated could reasonably be considered material in affecting the insurer's decision as to whether or not to enter into the contract, in estimating the degree or character of the risk, or in fixing the premium rate thereon"); LA Sound USA, 156 Cal. App. 4th at 1269 (stating that a misrepresentation is material where it affects the insurer's evaluation of risk and the amount of the premium charged).  While it is somewhat of an open question whether materiality can be decided as a matter of law, it is nonetheless generally recognized that "the fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law."  See, e.g., Merced Mut. Fire Ins. Co. v. State, 223 Cal. App. 3d 765, 772 (1991); cf. Mitchell v. United Nat. Ins. Co., 127 Cal. App. 4th 457, 475 & fn. 9 (2005)(questioning whether materiality can be decided as a matter of law, or whether it is a question for the trier of fact).

        Here, defendant justifies its rescission of the two policies at issue on the basis of several misrepresentations purportedly made by decedent:  (a) that decedent was the owner of the four properties supporting her applications for life insurance; (b) that decedent received $64,000 in rental income from those properties and had a net worth of $830,000; (c) that decedent's stated "purpose" in securing the policies was to pay of the mortgages associated with the properties in the event of decedent's death; and (d) that the mortgage amounts on both properties totaled $650,000 collectively.  See Def. Mot. Summary Judgment at 12:21-14:2.  The first alleged misrepresentation regarding decedent's ownership of the properties subsumes within it the second purported misrepresentation regarding decedent's rental income and net worth.  Similarly, the third misrepresentation regarding decedent's stated purpose in securing the policies subsumes within it the question whether decedent misrepresented that the mortgage pay off amount was $650,000 collectively.

        With these groupings in mind, the two questions for the court are (1) whether the

7

decedent did, in fact, make the foregoing factual misrepresentations; and (2) whether those misrepresentations were material. If so, then defendant's rescission was justified.

1. Ownership Misrepresentations

At first blush, the issue whether the decedent misrepresented the fact of her ownership on the applications for the '772 and '767 Policies appears clear cut. It is undisputed, for example, that the decedent did *not* own legal title to the four properties that allegedly underlie the decedent's applications for life insurance. Both parties, after all, acknowledge that legal title was not held in the decedent's name, but instead in the names of her son and daughter-in-law, Bhika and A. Hafiz. Thus, this would seem to end the inquiry, as the decedent's statement on both policies that she was an "owner" appears patently untrue. See, e.g., Newman Decl., Ex. F at Ex. 2 at 0041; id. at Ex. F at Ex. 3 at 0021 (statement that decedent wanted insurance to cover the mortgages of properties for which she was "owner").

Plaintiffs, however, contest that decedent's lack of legal title establishes that any misrepresentation of the fact of ownership occurred. They point out that no misrepresentation as to ownership could have occurred since the decedent was never asked in connection with either policy application whether she was the owner of any underlying properties, and furthermore that in view of the decedent's illiteracy and lack of understanding in the English language, her responses to questions asked by MetLife's application preparer Stan Velu cannot form the basis for any asserted misrepresentation.

As to both arguments, plaintiffs fail to persuade. With respect to the former, plaintiffs correctly point out that neither of the two policy applications actually calls for an express statement by the decedent in which she avows that she is the "owner" of any properties. Indeed, somewhat surprisingly, the policy applications do not even ask the applicant to identify the underlying properties in question.[2] See Newman Decl., Ex. F at 24-43 ('772

---

[2] The court does not address, as the parties have not squarely raised, the question whether there was duty on defendant's part to investigate the decedent's ownership status at some point in applications process prior to issuing the policies in question. The court notes,

8

Policy); id. at Ex. F at 02-23 ('767 Policy).  Moreover, Mr. Velu – the MetLife agent who prepared both of the decedent's applications – has no clear recollection of the questions he asked the decedent or the particular translations he may have made back in 2001.  See Newman Decl., Ex. H at 19; Cassinelli Decl., Ex. 1 at 46.  Notwithstanding these facts, however, plaintiffs do not actually submit any legal authority suggesting that an insurer's failure to include direct questions that lead to false or misleading answers later bars the insurer from acting upon the answers once the insurer has deemed those answers to contain misrepresentations.  Moreover, plaintiffs undermine their own suggestion that the application does not accurately reflect that she owned the properties at issue, by inconsistently arguing at other points in their briefing and before the court that the decedent *was*, for all intents and purposes, the owner of the properties.  In sum, plaintiffs cannot have it both ways – in arguing that defendant's failure to ask about ownership estops defendant from asserting a misrepresentation relating to same, plaintiffs contradict their claim that the decedent believed herself to be the owner of the property.  Thus, the court finds that regardless of whether a specific question was asked either by the application or by Mr. Velu, there is no dispute that the decedent represented herself as the owner to Mr. Velu.

      As for plaintiffs' second argument – that decedent's illiteracy and lack of understanding in the English language prevent any statements that she made to Mr. Velu during the application process from being counted as a misrepresentation against her – it ultimately fails, too.  Plaintiffs contend that the decedent was illiterate in both English and Hindi, her native language, and that Mr. Velu's translations from English to Hindi and vice versa, were inadequate.  Plaintiffs furthermore note the existence of a fellow district court opinion holding that an incorrect or incomplete response on an insurance application by an illiterate or non-fluent applicant does not constitute grounds for rescission of the policy, and

---

however, that neither party has submitted any legal authorities addressing this question, let alone establishing the existence of a such a duty.

9

1  a California Supreme Court holding that an insured's failure to appreciate the significance
2  of information given as an answer to an insurance application is also a valid defense to a
3  claim of misrepresentation.  See Trinh v. Met. Life Ins. Co., 894 F. Supp. 1368 (N.D. Cal.
4  1995); Thompson v. Occidental Life Ins. Co., 9 Cal. 3d 904, 916 (1973).

5        Trinh, however, is not controlling on this court.  And while Thompson *is* controlling,
6  and while it is true enough that Thompson reiterated the general principle that an
7  applicant's "fail[ure] to appreciate the significance of information related to him... would not
8  constitute grounds for rescission," Thompson only applied that principle to alleged
9  misrepresentations made in a medical or health insurance context.  That situation is
10 inapposite to the one here.  Thus, neither of the cases cited by plaintiffs persuades the
11 court that the decedent's illiteracy or failure to speak English properly prohibits any
12 misstatements from constituting misrepresentations as a matter of law.  Furthermore, it is
13 worth noting that pursuant to at least some Ninth Circuit precedent, albeit unpublished, the
14 mere fact that the decedent spoke Hindi does not mean her answers were incorrect, in view
15 of the fact that Mr. Velu *did* speak Hindi.  Moreover, plaintiffs' do not contest the entirety of
16 Mr. Velu's translation, only those portions that undermine their argument.

17       Having failed to persuade the court on the above grounds, plaintiffs move on to the
18 crux of their argument – i.e., the argument that the decedent could not have
19 misrepresented her ownership of underlying properties, because she *was*, in fact, the true
20 owner of the properties notwithstanding the fact that legal title was in her relatives' names.
21 Plaintiffs submit evidence that the decedent had entrusted approximately $5,000 to $6,000
22 to A. Hafiz and her husband Bhika, which was used by them to invest in properties on the
23 decedent's behalf.  See Cassinelli Decl., Ex. 5 at 128-130.  All parties purportedly
24 understood that "the properties purchased with this initial seed money belonged to [the
25 decedent] along with the rental income generated."  See id.  According to plaintiffs, this
26 arrangement is "customary in the Fijian-Indian [community] allowing older family members
27 to enjoy their later years free from the stress of managing their finances."  See id. at Ex. 1
28

10

at 26-27. Plaintiff A. Hafiz further testified that the decedent represented to other people that she was the owner of the properties, considered the properties to be hers, and visited the properties every now and then to "pick up the rents and stuff." See Cassinelli Decl., Ex. 5 at 53, 83, 128-30; Newman Decl., Ex. F at 81-83.

The issue is thus over the *kind* of ownership that decedent claimed on her policy applications. If plaintiffs can prove that, notwithstanding the lack of legal title to the underlying properties, the decedent was the owner of the properties in some other legal way, then it stands to reason that the decedent committed no misrepresentation by asserting her ownership over the properties in the underlying applications. The problem for plaintiffs, however, is that they fail to adequately establish that any other type of legally binding ownership status exists. It is true enough, for example, that legal title raises only a presumption of full beneficial ownership. See Cal. Evid. Code § 662 ("owner of the legal title to property is presumed to be the owner of the full beneficial title," which presumption "may be rebutted only by clear and convincing proof"). To that end, the presumption may be rebutted if plaintiffs come forward with clear and convincing proof of the decedent's equitable ownership over the properties in question. See, e.g., In re Yool, 151 Cal. App. 4th 867 (2007)(discussing equitable ownership vis-a-vis "resulting trust doctrine," which "arises by operation of law from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest"). Aside from a brief passing reference by defendant acknowledging that legal title raises only the presumption of ownership, however, neither party has focused on the issue of equitable ownership, let alone have plaintiffs submitted evidence or authorities supporting any other legally recognized ownership by decedent.

To the extent that plaintiffs seek a finding of equitable ownership based only on their evidence regarding the customs and practices of the Fijian-Indian community, and the plaintiffs' belief in the same (as opposed to the decedent's own testimony), this is insufficient, in the court's view, to discharge plaintiffs' burden with clear and convincing

11

proof, particularly because plaintiffs submit such evidence without tethering it to any legally recognized form of ownership. Simply put, there was no misrepresentation about ownership *if* the decedent did actually own the property in some recognized way. But while beneficial and equitable ownership are recognized by the law, and it might even be incumbent on an insurer to ascertain this type of ownership in addition of legal title, there was 1) no evidence presented of a legally cognizable form of ownership, and 2) no authority presented that "ownership by cultural practice" is recognized by the law. Moreover, in the absence of any authority, the court is disinclined to require that an insurer, when determining ownership of property, also attempt to determine if an applicant "believes" she owns property notwithstanding lack of legal title.

In sum, therefore, without proof – by clear and convincing evidence – that the decedent was, in fact, the owner of the underlying properties pursuant to some legally cognizable theory of ownership, the decedent's statement in both policy applications that she was the owner of the properties in question were, in fact, misrepresentations, regardless whether made intentionally or unintentionally. See Cal. Ins. Code § 331; Thompson, 9 Cal. 3d at 916 (material misrepresentation or concealment of such facts are grounds for rescission of the policy, and an actual intent to deceive need not be shown); Cal. West. States Life Ins. Co. v. Feinstein, 15 Cal.2d 413, 423 (1940). And since those representations cannot be excused by reason of Mr. Velu's translation or the decedent's limited English skills under the facts of this case, the misrepresentation was an actionable ground for rescission, if material.

Turning to that question of materiality, the court finds that the decedent's misrepresentation as to ownership was, in fact, material. Decedent's statements on the policy itself indicate that the purpose of the policy was for mortgage protection, and defendant treated it as such. Plaintiffs, moreover, do not dispute this point. Furthermore, defendant has satisfied their legal burden to prove materiality, by submitting evidence on the part of Eileen Kosiner, defendant's associate chief underwriter, testifying that defendant

would not have issued either of the policies in question had defendant been aware that the decedent did not, in fact, have legal title to the properties in question. See Declaration of Eileen Kosiner, ¶¶ 3-4.

Thus, the court concludes that the decedent's statements in both policy applications indicating that decedent was the owner of the properties in question were material misrepresentations that constituted a proper ground for defendant's rescission of both insurance policies.

In view of this finding, defendant's second alleged misrepresentation – i.e., that she had $64,000 in yearly rental income and a net worth of $830,000 – was also actionable. For it is undisputed that the veracity of both representations hinge on the veracity of the decedent's ownership of the properties in question. As such, the court's conclusion that the decedent materially misrepresented her ownership, also compels the finding that the decedent's corollary statements as to rental income and net worth, were also material misrepresentations.

2.  Mortgage "Purpose" Misrepresentations

Defendant also targets decedent's statements in both policy applications with respect to the "purpose" of the '772 and '767 Policies – namely, decedent's statement that the reason for the policies was to seek $650,000 collectively to pay off the mortgages associated with the properties in the event of decedent's death. See Newman Decl., Ex. F at 0041; id. at Ex. F at 0021. Putting aside the ownership aspect of decedent's representations as to the purpose of the policies, defendant contends that the decedent misrepresented the amount of combined outstanding mortgages on the properties. Defendant notes, for example, that the evidence shows that the mortgage owing on the underlying properties in 2001 totaled no more than $267,000 – less than the $400,000 benefit sought in connection with the '772 Policy by itself, and far less than the $650,000 benefit sought for both the '772 and '767 Policies combined. See Newman Decl., Ex. F at

13

56.[3]

Plaintiffs contest any misrepresentation on two grounds: (1) that, as demonstrated by the testimony of A. Hafiz, the amounts supporting the outstanding mortgage amounts stated by the decedent could have reflected more costs than the outstanding mortgage loan, such as maintenance costs, lines of credit, etc.; and (2) that any misrepresentations are (once again) chargeable to Mr. Velu's poor translation skills. See Newman Decl., Ex. F. at 62-65.

As with the ownership misrepresentations, plaintiffs' arguments are unconvincing. First, with respect to decedent's alleged misrepresentation as to the outstanding mortgage amounts owed on both properties, plaintiffs' submitted evidence does not actually dispute the fact that the amounts listed by the decedent on her application were misstated. Although the testimony of plaintiff A. Hafiz does, for example, note that the mortgage amounts listed by the decedent could have referred to other property-related debts that the decedent was including on the application, the actual amounts cited by A. Hafiz still add up to less than the amount stated by decedent in her policy applications. A. Hafiz testifies, for instance, that with respect to the '772 Policy, even adding in certain improvement costs and lines of credit, the total outstanding debts equaled approximately $342,000 – less than the $400,000 stated on the application. See Newman Decl., Ex. F at 62, 64-65. Moreover, as to any remaining debt amounts that the decedent could have been referring to on her applications, A. Hafiz testified that decedent "could have" included other amounts, and that A. Hafiz simply "didn't know" what they were. See id. In other words, even taking plaintiffs' submitted evidence as true, the evidence does not actually dispute the fact that the $400,000 mortgage amount listed on the '772 Policy, at least, was misstated by the

---

[3] In view of the court's conclusion that the decedent materially misrepresented the fact of her ownership as to the properties in question, it is unnecessary for the court to affirmatively decide whether the decedent also misrepresented the purpose of securing the policies in question. This is because the court's finding as to the ownership misrepresentations, standing alone, already justifies the defendant's rescission of the policies in question. Nonetheless, the court reaches the issue as an alternative basis for its decision.

14

decedent. Thus, the collective need for $650,000 coverage for both policies was also misstated.[4]

The court furthermore finds the decedent's misstatements as to the outstanding mortgage amounts listed as part of her stated purpose in securing both policies, material. As noted above in connection with the ownership misrepresentations, defendant's associate chief underwriter has testified that defendant would not have issued either of the policies in question had defendant been aware that the decedent did not, in fact, own properties "with a total mortgage of $650,000." See Declaration of Eileen Kosiner, ¶¶ 3-4.

In sum, the court finds that in stating that the purpose of securing both insurance policies was to "pay off" outstanding mortgage amounts of $400,000 and $250,000, for a collective total of $650,000, the decedent made a material misrepresentation of fact. As such, the misrepresentation constitutes a separate and independent basis for defendant's rescission of the '772 and '767 Policies.

Based on the foregoing, the court hereby GRANTS defendant's motion for summary judgment on plaintiffs' first and third causes of action alleging breach of contract. Plaintiffs' cross-motion for summary judgment as to the same claims is DENIED.

C.   Implied Breach of Contract Claims (Second and Fourth Causes of Action)

The parties also seek summary judgment with respect to plaintiffs' claims for bad faith denial of insurance. Defendant specifically contends that as a matter of law, no liability is possible, because there was a genuine dispute of coverage.

The ultimate test of bad faith liability in first party cases is whether the refusal to pay policy benefits, or alleged delay in paying, was unreasonable. See Carlton v. St. Paul Mercury Ins. Co., 30 Cal. App. 4th 1450, 1456 (1994). It is now settled law in California that an insurer denying or delaying the payment of policy benefits due to the existence of a

---

[4] To the extent, moreover, that plaintiffs once again rely on Mr. Velu's improper translation as grounds for excusing any purported misrepresentation, the court once again rejects plaintiffs' argument, for the same reasons discussed above in connection with the ownership misrepresentations.

"genuine dispute" with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract. See Hailey v. California Physicians' Service, 158 Cal. App. 4th 452, 472 (2007). A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. Id.

In the summary judgment context, moreover, "a [trial] court [may] grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable - for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law.... On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." See id. at 473.

Applying this standard here, defendant prevails. For even under plaintiffs' version of the facts here – in which the decedent was the actual "owner" of property and all stated rental income and fair market value of the properties was properly allocated to decedent – the court concludes that it was reasonable for defendant to have taken the position that legal title to the properties was necessary for proof of ownership. Even if plaintiffs believed that the decedent was owner of the properties pursuant to another type of legally cognizable theory of ownership, there was nonetheless a "genuine issue" as to the insurer's liability under California law under such circumstances. Furthermore, defendant's investigation into the facts, and defendant's conclusion as to lack of ownership – without proof by plaintiffs that they submitted to defendant proof of any alternative legal theory of ownership – was warranted. Indeed, the court is of the opinion that, under the circumstances here, no reasonable juror could find that defendant acted unreasonably in conducting its investigation and reaching the decision it did.

Moreover, plaintiffs' opposition to defendant's motion does not explicitly rebut defendant's arguments regarding bad faith. Accordingly, plaintiff has failed to point to any

evidence establishing bad faith per se, let alone disputing defendant's argument.

Accordingly, the court GRANTS defendant's motion for summary judgment as to plaintiffs' claims for bad faith as stated in plaintiffs' second and fourth claims for relief. Plaintiffs' cross-motion on the same claims is DENIED.

D.   Declaratory Relief Claim (Fifth Cause of Action)

Plaintiffs' fifth claim for relief seeks a declaration of the contractual rights of the parties vis-a-vis the two policies in question. Accordingly, the claim is premised on plaintiffs' other contractual claims – all of which have been discussed above. To that end, the court therefore GRANTS summary judgment in defendant's favor on plaintiffs' fifth claim for relief, and DENIES plaintiffs' motion as to the same claim.

E.   Punitive Damages

Finally, defendant seeks summary judgment with respect to plaintiffs' request for punitive damages. For the reasons below, the court agrees with defendant.

Preliminarily, defendant correctly notes that evidence of fraud, malice, or oppression (as required for a basis for punitive damages) must be supported by clear and convincing evidence, even at the summary judgment stage. See, e.g., Basich v. Allstate Ins. Co., 87 Cal. App. 4th 1112, 1118-19, 1121 (2001)("If the plaintiff is going to prevail on a punitive damages claim, he or she can only do so by establishing malice, oppression or fraud by clear and convincing evidence. Thus, any evidence submitted in response to a motion for summary adjudication must necessarily meet that standard."). Insurances cases, which typically ground punitive damages on claims of malice or oppression, rather than fraud (as appears to be the case here), consider malice or oppression to be shown where "despicable conduct" has been demonstrated. Despicable conduct is generally considered to be "conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1287 (1994). Such conduct has been described as "[having] the character of outrage frequently associated with crime." Id.

17

Here, there is simply no evidence of the type of conduct that would rise to the level of despicable conduct, sufficient to support a finding of punitive damages. Indeed, plaintiffs have essentially conceded the argument, as they do not address it, let alone attempt to introduce evidence that *would* support evidence of despicable conduct. Moreover, defendant's evidence as a whole – and as described above – generally supports the fact that, while defendant may not have been correct in denying benefits, defendant at least had a reasonable basis for its belief that there was a genuine dispute about coverage. For that reason, defendant engaged in a thorough investigation of claims under both policies. This does not support despicable conduct sufficient to establish a basis for punitive damages.

Accordingly, the court GRANTS summary judgment on the issue of punitive damages. This conclusion is also consistent with the case law passing on the availability of punitive damages in insurer cases. See, e.g., Mock v. Michigan Millers Mutual Ins. Co., 4 Cal. App. 4th 306, 329 (1992)(" 'a consistent and unremedied pattern of egregious insurer practices' [is required] in order for the insurer's 'bad faith' conduct to rise to the level of malicious disregard of the insured's rights so as to warrant the imposition of punitive damages."); Tomaselli, 25 Cal. App. 4th at 1288 (even "claims handling that is 'witless and infected with symptoms of bureaucratic inertia and inefficiency' does not add up to malice or oppression").

F.  Conclusion

For all the above reasons, the court hereby GRANTS summary judgment as to all causes of action, in defendant's favor. Plaintiffs' cross-motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: October 3, 2008

PHYLLIS J. HAMILTON
United States District Judge